UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

HEATHER JENKINS, ET AL                    CIVIL ACTION

VERSUS                                    NO: 05-370

SLIDELLA L.L.C., ET AL                    SECTION: J(5)

**ORDER AND REASONS**

Before the Court is Defendants Slidella, L.L.C.
("Slidella"), Sizeler Real Estate Management Company, Inc.'s
("Sizeler")**,** and Defendant/Third Party Plaintiff Flournoy
Construction Company, L.L.C.'s ("Flournoy") **Motion in Limine to
Exclude Testimony of Chester J. Doll (Rec. Doc. 163)**; Third-party
Defendant M&M Plumbing Co., Inc.'s ("M&M Plumbing") **Motion in
Limine Regarding the Testimony of Chester J. Doll (Rec. Doc.
216)**; Slidella, Sizeler, and Flournoy's **Motion in Limine
Regarding Testimony of Dr. Johnny Belenchia (Rec. Doc. 156)**; M&M
Plumbing's **Motion in Limine Regarding the Testimony of Dr. Johnny
Belenchia (Rec. Doc. 217)**; Slidella, Sizeler, and Flournoy's
**Motion in Limine Regarding Testimony of Dr. Ernest D. Lykissa
(Rec. Doc. 158)**; M&M Plumbing's **Motion in Limine Regarding the**

**Testimony of Dr. Ernest D. Lykissa (Rec. Doc. 215)**; Slidella and Sizeler's **Motion for Summary Judgment (Rec. Doc. 153)**; M&M Plumbing's **Motion for Summary Judgment (Rec. Doc. 124);** and Flournoy's **Motion for Partial Summary Judgment on Third Party Demand Against Trinity Universal Insurance Company (Rec. Doc. 160).**

These motions, which are opposed, were set for hearing on May 16, 2008 on the briefs.  Upon review of the record, the memoranda of counsel, and the applicable law, this Court now finds as follows.

## Background Facts

This matter arises out of alleged injuries sustained by Plaintiffs, Heather Jenkins and Melissa Dawn McKee, when they were allegedly exposed to high levels of Aspergillus and other molds in their apartment, which was owned and operated by Defendants Slidella and Sizeler,[1] and constructed by Flournoy, who subcontracted portions of the work to M&M Plumbing and Commercial Flooring and Mini-Blinds ("Commercial Flooring"). Plaintiffs lived in the apartment from February 1, 2004 through July 2004.

On February 11, 2005, Plaintiffs filed suit against Slidella and Flournoy, alleging that the apartment they rented from

---

[1]  Sizeler is Slidella's management company.

Slidella and constructed by Flournoy was contaminated with mold, causing Plaintiffs health problems.  Slidella subsequently filed a cross-claim against Flournoy and its insurer, Zurich American Insurance Company, for defense and indemnity in connection with Plaintiffs' claims.[2]  Flournoy in turn filed third-party demands against two of its subcontractors and their respective insurers: 1) M&M Plumbing and its insurer, Trinity Universal Insurance Company ("Trinity"); and 2) Commercial Flooring[3] and its insurer, Northern Insurance Company of New York, alleging that these subcontractors caused or contributed to the alleged mold contamination.[4]

## Discussion

**A.   Flournoy, Sizeler, Slidella, and M&M Plumbing's Motions in Limine re: testimony of Chester Doll**

Flournoy, Sizeler, Slidella, and M&M Plumbing collectively

---

[2]  This claim has since been dismissed.

[3]  Commercial Flooring was subcontracted to install the flooring and tile work in the bathroom, while M&M Plumbing was subcontracted to install the showers and plumbing work throughout the complex.  Commercial Flooring has since been dismissed by Flournoy as Flournoy's insurer, which is also the insurer of Commercial Flooring, decided to consolidate its defenses in this case.

[4]  In its third-party petition, Flournoy alleges that Slidella and Sizeler have alleged that certain work performed by M&M Plumbing was defective and non-conforming.  Flournoy denied these allegations, but alleged that to the extent Flournoy is found liable to the Plaintiffs or to Slidella and Sizeler, Flournoy is owed defense and indemnity from M&M Plumbing under both the terms of the subcontract and law.

seek to exclude the testimony of Plaintiffs' expert, Chester
Doll, who is offered as an expert in the field of mold
inspections, growth, exposure, and sampling techniques.
Defendants argue that Doll's opinions do not fulfill the
requirements for expert testimony pursuant to Federal Rule of
Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>,[5]
509 U.S. 579, 592-93 (1993).

The motion is premised on the fact that Doll deviated from
accepted industry standards in his testing methodologies in the
following ways:

(1)  Numerous publications and articles by nationally
accredited organizations in the mold and/or bioaerosol sampling
industry cite minimal industry standards concerning mold testing
that Doll did not meet during his one-day, three-sample test at
Plaintiffs' apartment.  He did not obtain non-complaint area
samples or "reference" samples that could be measured against the
complaint samples taken near the source of the alleged moldy
smell in the apartment closet.  Specifically, Mr. Doll took only
two air samples and one tape lift sample which is against
industry standards.  He also failed to take an air sample near

---

[5] In making the determination of reliability, the Court
should consider the following non-exclusive factors: (1) the
extent to which the theory has or can be tested; (2) whether the
theory ha been subject to peer review and publication; (3) the
technique's potential rate of error; (4) whether the underlying
theory or technique has been generally accepted as valid by the
scientific community.  <u>Daubert</u>, 509 U.S. at 592-94.

the purported cause of the alleged Aspergillus mold in the apartment, i.e., the upstairs bathroom.  And he failed to repeat his testing the next day, which is a deviation from the National Institute for Occupational Safety and Health ("NIOSH") sampling strategies;

(2)  The lab to which Doll sent the air samples was not accredited by a nationally recognized accrediting authority or an accrediting body recognized by "NACLA" or its equivalent, which is a practice recommended by the American Industrial Hygiene Association ("AIHA");

(3)  He did not quantify or document the atmospheric conditions, including temperature, humidity, or weather conditions on the date of testing, July 28, 2004, as is referenced by the AIHA's Field Guide for the Determination of Biological Contaminants in Environmental Samples, section 5.2.1. Such conditions are important in a mold assessment and sampling techniques, as temperature directly influences fungal growth;

(4)  He did not document his findings in the Plaintiffs' apartment in a required "Chain of Custody" document as is mandated by industry standards.  Doll's "Mold Testing Identification Report" is the entirety of Doll's documentation in this case, and consists mostly of broad statements about mold in general.  Without proper record keeping, Doll has no evidence of his methodology and of the sampling strategy he used at

Plaintiffs' apartment;

(5)  He did not quantify the existence of sweaty/wet athletic clothes being thrown into the downstairs closet by the plaintiffs and how "that could cause mold" as Doll admitted.  He failed to document this finding or even consider it a factor during his mold testing as an independent cause of alleged growth of Aspergillus mold.  According to Defendants, this is a possible superceding factor that was never documented nor considered by Doll in his report;

(6)  He did not document the fact that the plaintiffs were not living in the apartment at issue for three weeks prior to his test on July 28, 2004;

(7)  He testified that he did not know if the operation of an air conditioning system affects mold spores.  Industry standards clearly say that information about the functioning of an air conditioning system in an area being tested is necessary for an accurate interpretation of air test results; and

(8)  He has testified that the only standard he should follow when doing air mold testing is to "test the air outside and compare it to the air inside."  This is in clear disregard of the standards set forth by the AIHA, NIOSH, and ACGIH.

In addition, Defendants state that Doll's highest degree of formal education is in the counseling field.  The only actual education experience he received regarding mold sampling and

testing amounted from a two-day class.  Furthermore, Doll's home inspection "business" under which he operated his mold testing enterprise was not an official business registered with the Louisiana Secretary of State.

Finally, Defendants submit the affidavit of expert Larry Townsend, a Louisiana Registered Professional Environmental and Mechanical Engineer and board certified microbial consultant, in which Mr. Townsend testifies that Doll's methods do not follow the generally accepted methodology for mold testing and are thus unreliable.

In opposition, Plaintiffs argue that Defendants' arguments for excluding the results of Doll's report are "more properly focused on the weight accorded the evidence, not its overall admissibility."  Plaintiffs argue that Doll followed the protocol set forth in his training, and that his testimony, which Plaintiffs argue is limited to the collection of his samples and the air sample results report he received from the laboratory to which he submitted the testing results, should be allowed.

In reply, Defendants argue that Doll, in his report and deposition, attempted to offer evidence "well beyond the very narrow area the plaintiffs now propose."  Specifically, Doll related general causation opinions about the effects of Aspergillum/penicullum on humans.

This Court determines that the testimony of Chester Doll

should be excluded as it fails to pass muster under the <u>Daubert</u> standard.  Doll's testimony concerning mold sampling he performed at Plaintiffs' apartment and his alleged finding of Aspergillus mold is unreliable as it is supported by an inadequate factual foundation.  Furthermore, the sampling standards used by Doll do not follow the accepted scientific methodology used by certified experts in the mold sampling field.

**B.   Flournoy, Sizeler, Slidella, and M&M Plumbing's Motions in Limine re: testimony of Dr. Johnny Belenchia**

Flournoy, Sizeler, Slidella, and M&M Plumbing collectively seek to exclude the testimony of Plaintiffs' expert, Dr. Johnny Belenchia, which is offered by Plaintiffs to show that their chronic respiratory problems were caused in whole or in part by their exposure to mold at their apartment. Defendants argue that Dr. Belenchia's opinions do not fulfill the requirements for expert testimony pursuant to Federal Rule of Evidence 702 and <u>Daubert</u> 509 U.S. at 592-93.

Specifically, Defendants highlight the following issues:

**a.   Regarding Dr. Belenchia's qualifications:**

Defendants highlight the following concerns:

(1)  Dr. Belenchia obtained Board Certifications in "pulmonary and critical care."  He is not board certified as an allergist.  As suggested in <u>Roche v. Lincoln Property Co.</u>, this lack of board certification as an allergist is problematic,

8

particularly since the symptoms of which the instant Plaintiffs complain lie more in the filed of allergic medicine.  278 F. Supp. 2d 744.

(2)  The studies with which he is most familiar dealing with Aspergillus relate to occupational lung disease (as distinguished from residential exposure) and date from the 1970s, 1980s, and early 1990s.  In the recent decision of <u>Fraser v. 301-52 Townhouse Corporation</u>, 2006 WL 2828595 (Sup. Ct. N.Y. Sept. 27, 2006), the court undertook an extensive review of the vast scientific writings available associated with mold exposure and conducted a hearing on the issue with several doctors and specialists testifying, and concluded that the studies with which Dr. Belenchia is familiar are outdated.  <u>Id.</u>

Plaintiffs fail to respond to either concern in their brief opposition.

**b.  Regarding Dr. Belenchia's testimony and methodology:**

Defendants state that where a plaintiff claims that a substance caused his injury, he must show not merely general causation (i.e., that exposure to the substance at issue increases the risk of a particular injury), but specific causation (i.e., that the substance in question did, in fact, cause a particular individual's injury).  According to Defendants, it is also well settled that the reliability of a medical causation opinion requires the proffered expert to rule

9

out other likely causes.  See <u>Turner v. Iowa Fire and Equipment Company</u>, 229 F.3d 1202, 1208 (8th Cir. 2000); <u>Helen v. Shaw Industr., Inc.</u>, 167 F.3d 146, 156 (3d Cir. 1999).  In other words, "for a doctor to pass muster under <u>Daubert</u> he or she must perform a proper differential diagnosis."[6]

Differential diagnosis is "a process of elimination by which medical practitioners determine the most likely cause of a set of signs or symptoms from a set of possible causes."  <u>Pick</u>, 198 F.3d 241.  The essential components include: 1) ruling in through accepted testing methodology the various molds to which the plaintiffs were exposed in their apartment; 2) ruling out all other potential causes to determine that the plaintiffs' injuries were proximately caused by the molds in question, or, at least, that said molds aggravated pre-existing conditions; 3) performing appropriate physical examinations; 4) taking thorough medical histories; and 5) reviewing all relevant clinical tests and laboratory tests.

_____

    [6]  Most circuits have held that a reliable differential diagnosis satisfies <u>Daubert</u> and provides a valid foundation for admitting an expert opinion.  But see <u>Pick v. American Medical Systems, Inc.</u>, in which the Court stated that the Fifth Circuit "has not written on the question of whether an expert opinion based on differential diagnosis can meet the <u>Daubert</u> standard." 198 F.3d 241 (5th Cir. 1999).  In <u>Pick</u>, the Court opted not to make such a ruling, and instead assumed that even if the process of differential diagnosis can provide sufficient scientific reliability, the doctor in that case did not base his opinion regarding the cause of the plaintiff's illness on differential diagnosis.

Defendants deny that Dr. Belenchia performed a proper differential diagnosis. They state that they cannot be sure, as Dr. Belenchia did not provide a written expert report. Either way, Defendants note that Plaintiffs' symptoms could be caused by any number of other exposures and/or conditions. In this way, Dr. Belenchia failed to perform a differential diagnosis adequate to explain why exposure to Aspergillus mold at Plaintiffs' apartment is "the most probable cause of the Plaintiff's complaints."

And as for Dr. Belenchia's opinion that the Plaintiffs' exposure to Aspergillus rendered them hypersensitive to other allergens to which they would not be sensitive, Defendants argue that Plaintiffs have come forward with no authoritative support for this hypothesis.

In opposition, Plaintiffs argue that Dr. Belenchia did perform a sufficient differential diagnosis. Plaintiffs state: "[a]s a doctor formulating a diagnosis, Dr. Belenchia, by taking a history from the patient, reviewing other medical providers records, and ruling out other possible causes, performs a differential diagnosis."

In reply, Defendants argue against any notion that a proper differential diagnosis was performed and submit several deposition transcripts in support which, according to Defendants, reveal that Plaintiffs showed no sensitivity to Aspergillus. As

11

such, Dr. Belenchia has not and cannot explain why it is more probable than not that Plaintiffs' symptoms are attributable to exposure to Aspergillus rather than other allergens to which they have both tested positive.

### c. **Daubert** analysis

Defendants argue that Chester Doll is the only expert proffered by Plaintiffs who performed air sampling in the apartment and who is prepared to testify that he detected "elevated" levels of Aspergillus mold spores.  According to Defendants then, if Mr. Doll is not permitted to testify, the testimony of Dr. Belenchia relating to a possible causal connection between Plaintiffs' alleged exposure to mold and their injuries will lack essential factual support.

In opposition, Plaintiffs argue that if Mr. Doll is not permitted to testify, Plaintiffs will <u>not</u> lack factual support for the presence of mold in their apartment.  Mold was in fact detected by Slidella and Sizeler in Plaintiffs' apartment prior to Plaintiffs' residency there; two separate issues with moisture intrusion were noted during Plaintiffs' residency there; and three separate tests conducted shortly after Plaintiffs vacated the unit confirmed elevated levels of Aspergillus.[7]

---

[7]  Plaintiff attaches documents, notably, a "Spore Trap Report," which record these findings.  Defendants, in opposition, argue that such reports reveal nothing about the presence of Aspergillus in the apartment when Plaintiffs were living there as they were taken weeks after Plaintiffs had left the apartment.

Turning to <u>Daubert</u> specifically, Defendants point to <u>Fraser</u> in which the court concluded that "with the exception of one article, the scientific research has not established that indoor exposure to mold causes the symptoms for which the plaintiffs seek to recover in this action."  2006 WL 2828595, at *4. Furthermore, the <u>Fraser</u> court found that the evidence presented at the hearing held by the court demonstrated that:

> [T]here are no generally accepted standards for measuring indoor airborne mold; there are no generally accepted standards for the acceptable amount of mold in indoor air; there are many types of mold, each of which have different or no health effects; there are no standard scientific definitions for "dampness" or "moisture"; skin prick tests for allergy, which were not done here, were deemed the most reliable way to test for allergy by the literature [and the testifying doctors] . . . .

<u>Id.</u> at *26.  As a result, the <u>Fraser</u> court precluded the plaintiffs from introducing testimony demonstrating that mold caused their health complaints and dismissed plaintiffs' causes of action based upon personal injury.   <u>Id.</u>

The <u>Fraser</u> court went on to state that "plaintiffs failed to demonstrate that the community of allergists, immunologists, occupational and environmental health physicians and scientists accept their theory––that mold and/or damp indoor environments cause illness."   <u>Id.</u> at *26.  In other words, there are no medical or scientific authorities which even establish a general causal relationship, much less a case of specific causation, between such exposure and injurious consequences to human health.

13

Plaintiffs fail to respond to these arguments, merely stating that "any questions regarding [Dr. Belenchia's] diagnosis and treatment shall reflect the weight accorded his testimony."

Finally, Defendants note that Dr. Belenchia's "opinion"––that Plaintiffs' symptoms are consistent with mold exposure and that since they started (in the case with Plaintiff McKee) or were exacerbated (in the case with Plaintiff Jenkins) during the time in which Plaintiffs resided in the apartment at issue, their symptoms and illnesses must have been caused by mold exposure in the apartment––suffers from the fatal "leap of faith" condemned in both <u>Roche</u> and <u>Fraser</u>.  That is, he asserts a causal relationship based merely upon a temporal relationship between alleged exposure and the occurrence of symptoms.[8]

Plaintiffs also fail to respond to this argument.  Instead,

---

[8]  Defendant notes that Plaintiffs underwent several skin testing/scratch tests, and that neither Plaintiff showed sensitivity or allergy to Aspergillus at any point.  Plaintiff McKee's results were negative to mold sensitivity for all molds tested, including Aspergillus, but they were positive for numerous other allergens.  Plaintiff Jenkins tested severely allergic to the molds cladosporium and helminothosporium, but not Aspergillus, and she showed severe allergies to numerous other allergens, including grass pollens, etc.

Dr. Belenchia opines that the scratch test of Plaintiff McKee might have shown negative results because the test was performed too close in time to the exposure and she had not had an opportunity to develop an allergy.  However, as Defendants point out, the burden of proof is on the Plaintiffs in this instance, and as such, they should have had a scratch test performed before now and under proper conditions to meet their burden of proof.

as if anticipating this Court's granting of Defendants' motion in limine as to Dr. Belenchia's testimony, Plaintiffs request a continuance of the trial date should Dr. Belenchia be excluded in order to "select a physician more qualified . . . to address the plaintiffs' diagnosis and the causal relationship between their exposure to mold . . . and their present condition."

This Court determines that Defendants' motion in limine should be granted and that the testimony of Dr. Belenchia as to medical causation should be excluded as it fails to pass muster under <u>Daubert</u>.

**C.    Flournoy, Sizeler, Slidella, and M&M Plumbing's Motions in Limine re: testimony of Dr. Ernest Lykissa**

Flournoy, Sizeler, Slidella, and M&M Plumbing collectively seek to exclude the testimony of Plaintiffs' expert, Dr. Ernest Lykissa, a toxicologist,  which they believe will be offered by Plaintiffs to show that their chronic respiratory problems were caused in whole or in part by their exposure to mold at their apartment.  Defendants argue that Dr. Lykissa's opinions do not fulfill the requirements for expert testimony pursuant to Federal Rule of Evidence 702 and <u>Daubert</u>, 509 U.S. at 592-93.

Specifically, Defendants highlight the following issues:

(1)  Dr. Lykissa is not a medical doctor, but a Ph.D., and as such, he cannot render a medical diagnosis.  Defendants cite <u>Plourde v. Gladstone</u> in which the court held that an expert,

15

although he had a Ph.D. in toxicology, could not offer an opinion that the plaintiff's medical issues were caused by an exposure to a toxic chemical compound because that expert was not a medical doctor and had no experience or training in diagnosing and treating patients.[9]  190 F. Supp. 2d 708, 719 (D. Vt. 2002).  The <u>Plourde</u> court further concluded that under Federal Rules of Evidence 703 and <u>Daubert</u>, the doctor's lack of appropriate qualifications invalidated any attempt to rely on the opinions and medical records of previous examining physicians and to perform a differential diagnosis.  <u>Id.</u> at 719-20.   In his report, Dr. Lykissa states in direct contravention to this standard that "[a]fter a <u>thorough study of the extensive medical records</u> of these two, young, female patients, I have <u>formed the opinion</u> that while these two ladies lived in their apartment . . . they were exposed to seriously toxic (sensitizing) concentrations of Aspergillus mold spores . . . ." (emphasis added).

     (2)  Chester Doll is the only expert proffered by Plaintiffs who performed air sampling in the apartment and who is prepared to testify that he detected "elevated" levels of Aspergillus mold

---

     [9]  Defendants also point out that the Fifth Circuit has recognized the standard of medical doctors being the proper authority on medical diagnoses.  See <u>In re: Vioxx Products Liability Litigation</u>, 401 F. Supp. 2d 565, 587 (5th Cir. 2005) (a professor could not opine on the specific issues of a person's death since he was not a medical doctor nor could he review any clinical information of the deceased).

spores.  According to Defendants then, if Mr. Doll is not permitted to testify, the testimony of Dr. Lykissa relating to a possible causal connection between Plaintiffs' alleged exposure to mold and their injuries will lack essential factual support.[10]

(3)  Dr. Lykissa's purported testimony suffers from the same deficiencies associated with Dr. Belenchia's.  Like Dr. Belenchia, Dr. Lykissa did not perform an adequate differential diagnosis, did not examine the Plaintiffs, did not rule out other possible causes, has not applied reliable principles and methods, and espouses a theory or hypothesis that finds no support within the relevant scientific community.  Also, like Dr. Belenchia, Dr. Lykissa essentially applies a theory of temporal causation, which is improper as a matter of law.

In opposition, Plaintiffs state that Dr. Lykissa will testify regarding the effects of exposure to mold, including Aspergillus.  He will not be testifying to specific causation (that is the role of Dr. Belenchia).  Plaintiffs argue that Dr. Lykissa is qualified to offer relevant testimony as to the toxicological effects of Aspergillus and other molds.  Plaintiffs

_____

[10]  Plaintiffs make the same argument in opposition that they did with respect to Dr. Belenchia, namely, that if Mr. Doll is not permitted to testify, Plaintiffs will not lack factual support for the presence of mold in their apartment.  Mold was in fact detected by Slidella and Sizeler in Plaintiffs' apartment prior to Plaintiffs' residency there; two separate issues with moisture intrusion were noted during Plaintiffs' residency there; and three separate tests conducted shortly after Plaintiffs vacated the unit confirmed elevated levels of Aspergillus.

17

list in support Dr. Lykissa's qualifications and state that he has been admitted to testify as an expert in the field of toxicology in the areas of both pharmacology and environmental toxins.

In reply, Defendants note their concerns that Dr. Lykissa has offered clear opinions as to specific causation both in his report and in his deposition.

Plaintiffs have provided no information which this Court can consider to properly conduct a <u>Daubert</u> analysis as to this issue. As such, this lack of information alone is grounds to exclude Dr. Lykissa's expert testimony which this Court determines is proper.

**D.   Slidella and Sizeler's Motion for Summary Judgment**

Slidella and Sizeler move for summary judgment dismissing the claims of Plaintiffs should the Court exclude the expert testimony of Chester Doll, Dr. Johnny Belenchia, and Dr. Ernest Lykissa.

Chester Doll is the only expert proffered by Plaintiffs who performed air sampling in the apartment and who is prepared to testify that he detected "elevated" levels of Aspergillus mold spores.  Since this Court has excluded Mr. Doll's testimony, according to Slidella and Sizeler, the testimony of Drs. Belenchia and Lykissa, relating to a possible causal connection between Plaintiffs' alleged exposure to mold and their injuries will lack essential factual support.

18

According to Slidella and Sizeler, then, without the testimony of Drs. Belenchia and Lykissa, Plaintiffs will have no evidence of medical causation which is an essential element of their claim.  See <u>Roche v. Lincoln Property Co.</u>, 15 Fed. Appx. 597 (4th Cir. Apr. 7, 2006) (finding that the district court's exclusion of tenants' medical expert in a mold exposure case was not an abuse of discretion where expert failed to apply methodology of differential diagnosis to the facts, having unable to determine that the particular types of mold found in plaintiffs' apartment were the specific cause of their respiratory ailments and failing to exclude any other non-mold allergens to which plaintiffs were sensitive).

In opposition, Plaintiffs argue that if Mr. Doll is not permitted to testify, Plaintiffs will not lack factual support for the presence of mold in their apartment.

Based on this Court's exclusion of Dr. Belenchia's testimony, Plaintiffs will have no evidence of causation and as a result, summary judgment should be granted dismissing Plaintiffs' claims.

**E.   M&M Plumbing's Motion for Summary Judgment**

Based on the foregoing, this Court determines that M&M Plumbing's motion for summary judgment should be denied as moot.

**F.    Flournoy's Motion for Partial Summary Judgment on Third Party Demand against Trinity Universal Insurance Company**

Flournoy moves for partial summary judgment as to its third party demand against Trinity which seeks recognition of Flournoy's additional insured status and right to a defense from Trinity in connection with the claims made by Plaintiffs in this case.

Flournoy argues that the contract documents establish that Flournoy is an additional insured under the policy of insurance issued by Trinity to Flournoy's subcontractor M&M Plumbing.  As an additional insured, Flournoy argues that according to Louisiana law, an insurer must provide a defense to Flournoy if, assuming all of the allegations of the petition to be true, there would be both coverage under the policy and liability to Plaintiffs.  American Home Assur. Company v. Czarneicki, 230 So. 2d 253 (La. 1969).  Furthermore, the only evidence that may be considered in making the determination of whether a duty to defend is owed is the underlying petition(s) and the policy of insurance.  Id.

Therefore, to determine whether Trinity must provide a defense to Flournoy, this Court must determine whether Flournoy is an additional insured under the contract of insurance issued by Trinity to M&M Plumbing.  To do so, the following issues must be addressed: 1) what the Trinity Insurance Policy requires for

20

an entity to be considered an additional insured; 2) whether the
Subcontract required M&M Plumbing to name Flournoy as an
additional insured; and 3) whether Plaintiffs' claims arise out
of M&M's "ongoing operations" as is required in the Trinity
Insurance Policy for additional insured status.

    **1.    Trinity Policy of Insurance--Who Is an Insured**

Flournoy points to the language in the policy of insurance
issued by Trinity which defines who is an insured under the
policy.  The Commercial General Liability Coverage Expansion
Endorsement (33-0496 (7/10)) provides:

> Section II - WHO IS AN INSURED, is amended as follows:
>
> Each of the following is also an insured:
>
> > a.    Any person or organization you are required
> > by a written contract, agreement, or permit
> > to name as an insured, but only with respect
> > to liability arising out of:
> >
> > > 1.    "your ongoing operations" performed for
> > > that insured at the location designated
> > > in the contract, agreement, or permit;
> > > or
> > >
> > > 2.    Premises owned or used by you.

Flournoy argues that as there is a written contract
requiring M&M to name Flournoy as an additional insured, see
infra, Flournoy qualifies as such under the language in Section
II above.

**2.    Whether the Subcontract Requires M&M Plumbing to Name
Flournoy As an Additional Insured**

Flournoy admits that it is neither a named insured nor an
additional insured named by endorsement to the policy.  Instead,
to argue that it is an additional insured, Flournoy directs the
Court to the contract (the "Prime Contract") entered into between
Slidella (as owner) and Flournoy (as contractor); the
Supplementary Conditions of the Contract for Construction, which
is a supplement to the Prime Contract; and the contract (the
"Subcontract") entered into between Flournoy (as contractor) and
M&M Plumbing (as subcontractor).

The Prime Contract requires the contractor to procure and
maintain "comprehensive general liability and property damage
insurance . . . which will cover the Contractor's, the Owner's,
the Owner's Manager, the Owner's parent, and the Architect's
legal liability arising out of the Work performed by the
Contractor and any Sub-contractor . . . for property damage which
may arise from operations for which the Owner and the Architect
are not responsible" under the Prime Contract.

Flournoy argues that because the Subcontract has a provision
stating that the "Subcontract Documents" consist not only of the
Subcontract itself, but also the Prime Contract between Flournoy
and Slidella, all three documents should be read together to
determine which duties are owed to Flournoy by M&M and Trinity.

22

Specifically, Flournoy refers to the language in Paragraph 2.1 of the Subcontract which states that: "the Subcontractor [M&M Plumbing] shall assume toward the contractor [Flournoy] all obligations and responsibilities which the Contractor, under such documents, assumes toward the Owner and the Architect.  The Contractor shall have the benefit of all rights, remedies and redress against the Subcontractor which the Owner, under such documents, has against the Contractor."

Relying on this language, Flournoy argues that the Subcontract requires M&M Plumbing to name Flournoy as an additional insured under M&M Plumbing's policy of insurance just as that obligation was imposed upon Flournoy in the Prime Contract to name Slidella as an additional insured under Flournoy's policy of insurance.  Flournoy points out that M&M understood and attempted to satisfy this obligation by the series of certificates of insurance provided to Flournoy by and on behalf of M&M Plumbing which reflect that Flournoy is in fact an additional insured under the Trinity policies.[11]

In opposition, Trinity argues that contract documents do not require M&M Plumbing to name Flournoy as an additional insured.

---

[11]  Flournoy admits that certificates of insurance cannot alter coverage afforded under an insurance policy, but argues that these certificates establish, at a minimum, that both Flournoy and M&M understood that M&M had a contractual obligation to name Flournoy as an additional insured under the Trinity policy.

Trinity states that Flournoy's arguments which "distort and stretch the language of the sub-contract agreement" are without factual or contractual basis.

Trinity notes that in the interpretation of contracts, the specific provision controls the general; one section of the Subcontract cannot be construed or applied separately at the expense of disregarding a more specific provision. Smith v. Burton, 928 So. 2d 74, 79 (La. App. 1st Cir. 2005). Trinity points to Article 13 of the Subcontract which specifically addresses insurance obligations and requirements for M&M Plumbing. Article 13 addresses insurance and bonds and requires the subcontractor to purchase and maintain insurance in certain amounts. The provisions of this section mention nothing about a requirement to name Flournoy or any other entity as an additional insured. Trinity also points to Section 5.3.1.3 of the Prime Contract which also relates specifically to insurance and states only that "the Subcontractor to carry and maintain, at a minimum, general liability insurance with limits of $500,000 per occurrence and $1,000,000 aggregate and workers compensation in statutory limits, and to file certificates of such coverage with the Contractor." Again, this specific provision mentions nothing about a requirement to name Flournoy or any other entity as an additional insured on the subcontractor's policy.

Further, Trinity notes that other courts have determined

that the general language of the subcontract relied upon by Flournoy "was intended to cover the quality and manner of performance of the subcontractor."  See <u>U.S. For Use and Benefit of T/N Plumbing and Heating Co. V. Fryd Constr. Corp.</u>, 423 F.2d 980, 983 (C.A. Fla. 1970) ("we hold . . . that a general incorporation by reference, of the terms of the principal contract into the subcontract, refers only to 'the quality and manner of the subcontractor's work"); see also <u>H.W. Caldwell & Son, Inc. V. U.S. for Use and Benefit of John H. Moon & Sons, Inc.</u>, 407 F.2d 21, 23 (C.A. Miss. 1969) (same).

This Court agrees that Flournoy's reading of the Prime Contract (including the supplement) along with the Subcontract to find that M&M Plumbing was required to name Flournoy as an additional insured results in a strained interpretation.  Had Flournoy required M&M Plumbing to name it as an additional insured, that obligation could and should have been set out in Article 13 of the Subcontract.  It is not within this Court's authority to re-write the subcontract between M&M Plumbing and Flournoy, or to insert obligations into the subcontract that are not expressly stated.

Out of an abundance of caution, however, this Court now turns to the final factor that must be satisfied.

25

3.   **Trinity Policy of Insurance--Do Plaintiffs' Claims
      Arise out of M&M's "Ongoing Operations"**

Referring again to Section II of the Commercial General
Liability Coverage Expansion Endorsement (33-0496 (7/10)) in the
Trinity policy of insurance, to be considered an additional
insured, not only must there be a written contract requiring M&M
Plumbing to name Flournoy as an additional insured, but the
liability must arise out of M&M Plumbing's "ongoing operations."

Flournoy argues that Trinity's policy does not define
"ongoing operations.  It points to a Louisiana case that has
interpreted "ongoing operations" to require only that the
accident at issue be related to the named insured's work.
Boucher v. Graphic Packaging Intern., Inc., No. 05-37, 2007 WL
1655655 (W.D. La. June 5, 2007) (because the accident at issue
was directly related to then named insured's work, the "ongoing
operation" clause was satisfied and the policy extended
additional insured status).  To support its argument that M&M was
still involved in ongoing operations at the apartment site,
Flournoy attaches contractor sign-in sheets to its motion.  Thus,
according to Flournoy, as Plaintiffs content they suffered
personal injuries from mold in their apartment which Flournoy
alleges could only have been caused by the negligence of its
subcontractors, the accident at issue is clearly alleged to be
related to M&M Plumbing's work, meaning that Trinity owes

26

Flournoy a defense as an additional insured.

In opposition, Trinity argues that the alleged liability of Flournoy does not arise out of M&M Plumbing's "ongoing operations," but rather from M&M Plumbing's "completed operations," or work that had been put to use by Plaintiffs who rented and resided in the apartment.  The insurance policy details two types of liability that can arise--liability arising from ongoing work and liability arising from completed work--and sets different limits for each.  The "products-completed operations hazard" is defined in the policy and provides that M&M Plumbing's work is "deemed completed at the earliest of the following times: . . . (3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.  Work that may need service, maintenance, correction repair or replacement, but which is otherwise complete, will be treated as completed."

Trinity explains that the entire apartment complex in which Plaintiffs' resided consists of nineteen buildings.  Flournoy does not allege in its motion that M&M Plumbing was performing work in Plaintiffs' specific unit or even in building 11, which is the building in which Plaintiffs' unit was located.  What Flournoy does argue is that because M&M Plumbing may have been performing work in another section of the complex, that the

27

alleged liability in this case "arises out of" M&M Plumbing's "ongoing operations." However, based on the policy language, M&M Plumbing's work in Plaintiffs' unit was a completed operation rather than an ongoing operation as Plaintiffs were actually living there. As a result, Trinity argues that coverage under the additional insured endorsement is not triggered.

It is clear that M&M Plumbing had completed its work on Plaintiffs' unit such that any liability of M&M Plumbing arises out of "completed operations" rather than "ongoing operations." Under these circumstances, Flournoy does not qualify as an insured; there is no coverage under the endorsement to the policy; and Trinity has no duty to defendant Flournoy against the claims of Plaintiffs or other parties. As a result, Flournoy's motion must be denied. Accordingly,

IT IS ORDERED that Slidella, Sizeler, and Flournoy's **Motion in Limine to Exclude Testimony of Chester J. Doll (Rec. Doc. 163)** is hereby **GRANTED.**

IT IS FURTHER ORDERED that M&M Plumbing's **Motion in Limine Regarding the Testimony of Chester J. Doll (Rec. Doc. 216)** is hereby **GRANTED.**

IT IS FURTHER ORDERED that Slidella, Sizeler, and Flournoy's **Motion in Limine Regarding Testimony of Dr. Johnny Belenchia (Rec. Doc. 156)** is hereby **GRANTED.**

IT IS FURTHER ORDERED that M&M Plumbing's **Motion in Limine**

28

Regarding the Testimony of Dr. Johnny Belenchia (Rec. Doc. 217) is hereby **GRANTED.**

  **IT IS FURTHER ORDERED** that Slidella, Sizeler, and Flournoy's **Motion in Limine Regarding Testimony of Dr. Ernest D. Lykissa (Rec. Doc. 158)** is hereby **GRANTED.**

  **IT IS FURTHER ORDERED** that M&M Plumbing's **Motion in Limine Regarding the Testimony of Dr. Ernest D. Lykissa (Rec. Doc. 215)** is hereby **GRANTED.**

  **IT IS FURTHER ORDERED** that Slidella and Sizeler's **Motion for Summary Judgment (Rec. Doc. 153)** is hereby **GRANTED.**

  **IT IS FURTHER ORDERED** that M&M Plumbing's **Motion for Summary Judgment (Rec. Doc. 124)** is hereby **DENIED** as moot.

  **IT IS FURTHER ORDERED** that Flournoy's **Motion for Partial Summary Judgment on Third Party Demand Against Trinity Universal Insurance Company (Rec. Doc. 160)** is hereby **DENIED.**

  New Orleans, Louisiana, this 27th day of June, 2008.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE